# Elsberry *v.* Seay.

*Bill in Equity by Citizens and Tax-payers, for Injunction against Trustees of Alabama Colored University.*

1. *Constitutionality of act establishing Alabama Colored University.* The "Alabama University for the colored people," as established by the act approved February 27th, 1887 (Sess. Acts 1886–7, p. 198), being under the exclusive control and management of a board of trustees appointed and selected as therein provided, and not subject to the supervision of the State superintendent of education, in whom is vested the general supervision of the public schools as established and regulated by constitutional provisions, can not be regarded as one of these public schools; and the sums appropriated by said act for the purchase of lands, the erection of buildings, and the annual support and maintenance of the University, being "set apart and appropriated from the school fund for the education of the colored people," which is an unauthorized perversion of the funds from their only proper use,—such appropriations are unconstitutional and void; and the other parts of the enactment being incapable of operation, without the aid of these unconstitutional provisions, the entire act is void.

2. *Parties to bill.*—A bill being filed by citizens and tax-payers, to enjoin the further payment of moneys out of the State treasury in aid of the Alabama Colored University, on the ground that the act establishing it is unconstitutional; the several trustees of the institution, the governor in his official capacity, the State superintendent of education as one of the trustees, but not officially, and the State treasurer, are all properly joined as defendants.

APPEAL from the City Court of Montgomery, in equity.

Heard before the Hon. THOS. M. ARRINGTON.

The bill in this case was filed on the 5th September, 1887, by W. E. Elsberry and Alex. Troy, resident citizens, tax-payers, and owners of property in the city and county of Montgomery, in behalf of themselves and other citizens and tax-payers, against the following persons as defendants: "Governor Thomas Seay, Fred. H. Smith, State treasurer, H. M. Caldwell, Charles Whelan, Thomas G. Jones, Fleming Law, J. M. Potts, E. M. Peterson, Jr., and Solomon Palmer, State superintendent of education, constituting the board of trustees of the Alabama Colored University," as established by and under the provisions of the act approved February 27th, 1887.—Sess. Acts 1886-7, pp. 198-201. At a meeting of the trustees held in July, 1887, the University was located at Montgomery, and a tract of land was purchased on which to erect the necessary buildings. The bill alleged

[Elsberry v. Seay.]

that this was done against the wishes and protest of the citizens of Montgomery, in violation of the provisions of the act; and it assailed the validity of the enactment itself, on several constitutional grounds, and prayed a decree declaring it unconstitutional and void, and an injunction to prevent the payment of any money out of the treasury under its provisions. The ground on which the opinion of the court is based renders unnecessary a statement of the other grounds of objection set out in the bill. The defendants, jointly and severally, demurred to the bill, for want of equity, and on account of misjoinder of parties. The court sustained the demurrer, and dismissed the bill, the complainants declining to amend; and this decree is here assigned as error.

WATTS & SON, for the appellants.

THOS. N. MCCLELLAN, Attorney-General, *contra.*

CLOPTON, J.—The material question presented for decision is the constitutionality of "An act to establish the Alabama University for the colored people, and to provide for its support and government," passed at the last session of the General Assembly.—Acts 1886-87, p. 198. Importance attaches to the question, because of its relation to the educational interests and enterprises of the State, and of its bearing upon the system of common schools. Its solution depends upon the proper construction of the act and of Article XIII of the present constitution. The article, construed as a whole, is mandatory, enjoining a duty, and creates limitations upon the mode of its performance. The first section declares: "The General Assembly shall establish, organize and maintain a system of public schools throughout the State, for the equal benefit of the children thereof, between the ages of seven and twenty-one years; but separate schools shall be provided for the children of African descent." The primary object of inquiry is the meaning and intent of the framers of the constitution, and of the people in adopting it, as manifested by the terms employed, when considered in connection with the prior and existing state of things. When words and phrases are employed which have acquired a defined popular signification, the manifest inference is, that they are used in their known and defined meaning and sense, no intention being apparent, from the nature and manner of use, or otherwise, to attach any other signification. In order

to give the terms employed such operation and force, according to their legitimate meaning as generally and ordinarily understood, so as to fully accomplish the object intended, resort may properly, and should, be had to the history of the subject of the constitutional provision, especially in reference to the preceding State constitutions and legislation, and to the condition of the subject at the time of the adoption of the constitution under construction.

The constitutions of 1819, 1861, and 1865, only declared generaly, that schools and the means of education shall forever be encouraged in this State; and required the General Assembly to take measures to preserve the lands granted by the General Government for the use of schools in each township; and to apply the funds accruing therefrom in strict conformity with the object of the grant. The system of common schools, as they now exist in Alabama, originated while the constitution of 1819 was in force, and was founded on the grant of the sixteenth section in every township by the United States to the inhabitants of such townships, for the use of schools, as provided by the act for the admission of the State into the Union. The legislature, by acts professedly adopted in pursuance with the requirements of the constitution, provided for the organization and establishment of a public school in every township, to be under the control of "School Commissioners," appointed from the freeholders or householders in the township; and of trustees for each school district, if the township should be divided into districts, for the convenience and advantage of the inhabitants. The commissioners and trustees were constituted corporate bodies, and were required to reside in the township, or district, as the case may be. The commissioners were charged with the control of the funds arising from the granted lands, and with their application exclusively to the use and maintenance of the public schools in the township. Clay's Dig. 519.

The system of common schools, as thus organized and established, was continued, with changes and modifications suggested by experience, but not affecting its general character, and was in existence when the constitution of 1868 was framed. The first section of Article 11 of this constitution declares: "The common schools, and other educational institutions of this State, shall be under the management of a Board of Education, consisting of a Superintendent of Public Instruction and two members from each congressional

[Elsberry v. Seay.]

district.  The Governor of the State shall be *ex officio* a
member of the board, but shall have no vote in its proceed-
ings."   The supervision of the public schools was vested in
the Superintendent of Public Instruction, who was made
president of the board.   The framers of the constitution
recognized in terms the common schools then in existence, as
constituting a system of public education, separate and dis-
tinct from the other educational institutions of the State;
which is further manifested from the provisions, that one-
fifth of the aggregate annual revenue shall be devoted ex-
clusively to the maintenance of *public schools*, immediately
following a provision that other enumerated funds shall be
inviolably appropriated to educational purposes generally.
The existing system of common schools remained in opera-
tion, with such modifications as were proper to adapt it to
the new mode of management, and others intended to increase
its efficiency as a distinctive system; the most material of
which were, the appropriation to each county of the poll-tax
collected therein as school money, and the apportionment of
the general school fund among the counties.

Furthermore: The principle of free elementary education
is not of modern origin.   Public schools were established
for the education of the children of the community, in States
which have long since perished; and in some European States,
systems of popular education were created at an early period.
In New England, common schools originated more than two
centuries ago, and with the spread of popular enlightenment,
and the increase of material prosperity, have received in this
country their most enlarged development; until a system of
public schools has been established in every State of the
Union, varying in details, but all preserving the leading fea-
ture and distinguishing characteristic—the extension of the
opportunities and benefits of popular education to all the
children of school age in the State.   From the necessity of
their origin, and from the fundamental principles on which
they are founded, and have been fostered, common or public
schools have acquired a well-defined popular signification, as
distinguished from other public institutions of education.

With knowledge of this popular meaning as understood
from history, and especially from the nature and character of
the legislation of this State, the convention framed the con-
stitution of 1875 for adoption by the people.   Controlled by
the conservative principle, that the diffusion of knowledge,
at least elementary, is essential to the preservation of free

government, and, as conducive to this end, the extension of the opportunities and advantages of education through the various parts of the State, the convention declared, and incorporated in the organic law, that a system of public schools shall be established, organized and maintained; but, for the first time in the State constitution, specially designated its character, extent and purposes. The constitutional system of common schools must extend throughout the State, and must afford equal benefit to all the children thereof within the specified years. The General Assembly is without authority to establish a system of common schools, which does not possess, in its entirety, these distinguishing features. It is more than a presumption, that the term, *public schools*, was employed in the constitution in its popular meaning and sense—the system of public schools to which the people of the State had been accustomed, and as they would understand it, in adopting the constitution. As we have said in another case, the system of public schools, commanded to be established, organized and maintained, was intended to operate upon, and in favor of all the children equally, without special local privileges to any.—*Schultes v. Eberly*, 82 Ala. 242.

The constitution intends, and the system must provide for, the location of schools in the various and different localities of the State. To this end, the Sixteenth Section fund was regarded a trust fund for local schools; and it was also provided that the annual poll-tax shall be applied to the support of the schools in the counties where it is levied and collected. Equality of benefit, embracing all the children, in whatever part of the State, is the fundamental and controlling principle, which must be maintained, if the constitutional requirements are observed. Though separate schools for the children of the two races are wisely provided, equal benefit enures and is preserved by the apportionment of the aggregate school fund between the races, in proportion to the number of children of each race. The system may consist of graded schools—from the primary to the high school, and of higher grades; but provision should be made, when requisite, in each school for the education of all the children, within the constitutional ages, in the same branches; age, capacity and advancement only being regarded. The intention is, that education in the same branches shall be equally accessible to all the children of the State.

The act in question, not only does not purport, but negatives the idea, that the University thereby established should

constitute a part of the system of common schools. It establishes a University, with the implied privileges and powers appertaining to such institutions of learning, and as contra-distinguished from high schools, and even colleges. It is not subject to the supervision of the Superintendent of Education, in whom the constitution vests the supervision of the public schools. It provides for the appointment of trustees, who are empowered to elect a faculty, and such officers and agents as they deem necessary; to discharge any member of the faculty, or officer or agent, at their pleasure; to prescribe their duties, and fix their compensation; and, generally, to govern and control the faculty and the University, "so that the students therein may be taught in the best manner possible the things they are to live by, preferring always the English language and the industries, to an education for culture only." | The act authorizes the trustees, in the event no suitable lands or buildings are given for the location of the University, to buy not exceeding forty acres of land, and, for the purpose of buying the land and erecting suitable buildings thereon, appropriates the sum of ten thousand dollars, payable on the order of the Governor, in amounts, and at times specified; and also appropriates for the support and maintenance of the University the sum of seven thousand and five hundred dollars annually, to be paid to the treasurer in equal installments, on the first days of January, April and October of every year; and further provides that these several sums so appropriated shall be "set apart and appropriated from the school fund for the education of the colored race."

It is contended, that if the University is held not to be a public school in the meaning of the constitution, the legislature had the power to repeal by implication, *pro tanto*, the act appropriating money for the support of public schools, and such is the effect of the act establishing the University. We do not doubt the power of the legislature to establish Universities, or other institutions of learning, distinct from the public schools, and to make appropriations for this purpose, provided the constitutional majority is obtained; nor the power to repeal, directly or by implication, any act approrpriating money for the use of the public schools, provided the school fund is not thereby reduced below the *minimum sum* fixed by the constitution. But the legislature is unauthorized, by express or implied repeal, to disturb or destroy the equality of the apportionment of the sum appro-

priated for public schools, between the respective races, and devote a portion of the amount apportioned exclusively to one race, to another foreign and distinct purpose, leaving the amount apportioned to the other race intact: *a fortiori*, the same result can not be accomplished by a direct appropriation of a part thereof. This is the effect and operation of the act establishing the University, and consequently in this respect it violates the letter and spirit of the constitution.

Having reached the conclusion, that the University is not a public school in the meaning of section one of article XIII of the constitution, and as the appropriations for its establishment are expressly set apart and appropriated from the school fund for the colored race, we are forced to hold, that the seventh and tenth sections of the act are unconstitutional; and as what remains is incapable of full execution according to the legislative intent, the entire act falls.

It is urged, that the logical sequence of the principles herein announced is the unconstitutionality of the several acts establishing the Normal schools, and that the recognition in the constitution of those in existence at the time of its adoption was tantamount to an interpretation thereof, on which the constitutionality of the act in question may be sustained. Normal schools are mentioned only in section 34 of article IV, which provides: "No appropriation shall be made to any charitable or educational institutions not under the absolute control of the State, other than Normal schools estalished by law for the professional training of teachers for the public schools, except by a vote of two thirds of all the members elected to each house." This section merely exempts such schools, whether in existence at the time of the adoption of the constitution, or established thereafter, from the requirement, that a two-thirds majority shall be requisite to make appropriations for their support. It does not serve to intepret article XIII of the constitution. Normal schools may or may not be regarded a part of the system of public schools, and as adjuncts thereto, according to the provisions of the creating acts. As to the constitutionality of these acts, or either of them, we neither express or intimate an opinion. They are not before us. It will suffice to decide the question when the necessity arises and it shall become our duty.

Though some of the defendants may not be necessary, we regard them all as proper parties on the case made by the bill. All of them are charged with the performance of some

[Elsberry v. Seay.]

acts in the execution of the statute establishing the University. The sum appropriated to buy the land and erect buildings thereon is made payable on the order of the Governor, and the trustees are authorized to purchase the land, and by implication to expend the money for this purpose. The defendant Palmer is a proper party, being a member of the board of trustees, but should not have been made a party in his capacity of Superintendent of Education. This, however, may be regarded as surplusage.

Reversed and remanded.