# Southern Railway Co. *v.* St Clair Co.

### *Action to Recover Taxes.*

| 124 | 491 |
| 124 | 259 |
| f124 | 546 |
| 125 | 700 |

| .4 | 491 |
| 135 | 473 |

1. *Taxation; authority of county over.*—The legislature has the power to authorize a county, keeping within the constitutional limitation of taxation on property, to appropriate a part of the revenue derived from such taxation in aid of the public schools therein. Hence, "an act to provide for the better support and maintenance of the public schools of St. Clair county," by which the commissioners' court of the county is authorized to levy and collect under the laws of the State an annual tax of ten cents on the hundred dollars worth of all taxable property in the county as assessed for revenue for the State, for the support and maintenance of the public schools of the county, with *proviso* that the tax rate of said county shall not exceed the constitutional limitation, is not open to any objection which would justify its being declared violative of the organic law.

APPEAL from St. Clair Circuit Court.
Tried before Hon. GEO. E. BREWER.
The case is stated in the opinion.

SMITH & WEATHERLY, for appellant, cited the following authorities.—*Schultes v. Eberly,* 82 Ala. 242; *Elsberry v. Seay,* 83 Ala. 614; *Montgomery v. State,* 88 Ala. 141; Constitution, Art. XIII, § § 1 to 5, 7 and 11; *Mayor v. Stonewall Ins. Co.,* 53 Ala. 582; *Stanfel v. Dallas Count,* 80 Ala. 290.

INZER & GREENE, *contra,* cited, 3 Brick. Dig., p. 171, § § 2, 5; *Baldwin v. City Council of Montgomery,* 53 Ala. 43 *ι*; 44 Ala. 493; *Stein v. Mayor &c. of Mobile,* 24 Ala. 591.

PER CURIAM.—The action in which the appellee was plaintiff, and the appellant defendant, was brought to recover of defendant taxes on property, having its situs in the county of St. Clair. As is admitted, the taxes were levied and assessed by authority of an act of the general assembly, approved February 18th, 1895, entitled "An act to provide for the better support and maintenance of the public schools of St. Clair county." (Pamph. Acts, 1894-5, pp. 914-16). By the act, the commissioners' court of the county is authorized to levy and collect under the laws of the State, an annual tax of ten cents on the one hundred dollars worth of all taxable property in the county, as assessed for revenue for the State, for the support and maintenance of the public schools of the county, *"Provided,* the tax rate of said county shall not exceed the sum of fifty cents on the one hundred dollars." Provision is made for the payment of the taxes as collected into the county treasury, and for the application and distribution of the moneys to the several townships and school districts of the county, corresponding to the general statutes regulating the distribution of moneys received from the State for the maintenance of the public schools of the county. Further reference to the act is not necessary, as no question touching its interpretation or construction is now presented.

The primal, decisive question, the case involves, is, whether it lies within legislative power, to authorize a county, keeping within the constitutional limitation of taxation on property, to appropriate a part of the revenue derived from such taxation, in aid of the public schools therein? Or, to state the question in a form meeting the argument directed against the validity of the enactment, is not the constitution prohibitory of all local taxation in aid of the public schools? Whatever may be the form in which the question is stated, it is of manifest importance to all the people of the State,

and on its solution may depend in a large degree, the prosperity and usefulness of the public schools, in counties, and municipalities, in which similar legislation now exists. This, however, can be regarded only as admonitory of the gravity of the question, and of the care and deliberation with which it must be considered and determined. Taxation, though promotive of the public welfare, cannot be supported, if there is not authority of law for its imposition.—Cooley Const. Lim. 636.

The prohibition of legislative power, it cannot be, and has not been insisted, is express. All that can be said, is, that as to local taxation, in aid of the maintenance of the public schools, the constitution is silent—neither, in express words, authorizing or prohibiting it. Of necessity, therefore, the insistence resolves itself into the inquiry, whether the prohibition is a necessary implication from the parts of the thirteenth article of the constitution, having relation to public schools and their maintenance; it is from these parts, the implication is sought to be deduced.

While all legislative power is vested in the general assembly, it cannot be doubted, that there may be implications arising from the constitution, operating as prohibitions, or as limitations upon the exercise of the power. The implication must, however, as is said by Judge Cooley, "be a necessary, not a conjectural or argumentative one."—Cooley Const. Lim. 78. From the express, affirmative provision of the constitution, that "separate schools be provided for the children of citizens of African descent," the implication necessarily arises, that by legislation the children of the two races shall not be commingled in the public schools—the implication is necessary to effectuate the intention of the framers of the constitution, deduced from its express, affirmative words. So, from the appropriation of the poll tax—known in all our legislative history, as a tax upon male inhabitants of a designated age—to the maintenance of the public schools in the county in which it is levied and collected, the necessary implication is, that the tax must not be applied to any other use or purpose; and if double taxation be avoided, that no other State poll tax shall be levied and collected. There are other necessary

implications deducible from this article, to which now there is no occasion for reference or suggestion. But, in the absence of express, affirmative provision, from the mere silence of the constitution in reference to any subject, prohibition of legislative power cannot be implied. When the constitution is silent, the power to legislate exists, or there must be departure from the established principle, "that constitutions are not in the nature of enabling acts, but are limitations upon the otherwise boundless powers of the legislature; or in other words, that the general assembly is not to look to the organic law to ascertain what is permitted it to do, but only to find what inhibitions are thereby put on its action." *Mayor v. Klein,* 89 Ala. 465; *Sharpless v. Mayor,* 21 Penn. St. 147; (s. c. 59 Am. Dec. 759) ; *Commonwealth v. Maxwell,* 27 Penn. St. 446. In *Prouty v. Stover,* 11 Kansas 256, defining the nature and extent of implications, which are indulged to avoid legislation, Judge Brewer said : "To sustain an implied inhibition, there must be some express, affirmative provision. The mere silence of the constitution on any subject cannot be turned into a prohibition." * * * * "To sustain an implied inhibition, the express provision must apply to the exact subject-matter, and the inhibition will not be extended further than is necessary to give full force to that provision." * * * * "To declare a law void as conflicting with an express provision of the constitution, the conflict must be clear. So say all the authorities. None the less clear must the conflict be, when it is conceded that no express provision has been violated, and only claimed that some negation must be implied from the affirmative language of the constitution which is irreconcilable with the law." The subject-matter—the "exact subject-matter" of the statute drawn in question, is the levy of taxes on property, by the proper authorities of the county of St. Clair, in aid of the public schools therein, observing the limitations of the constitution as to county taxation of property. As to the rate of such taxation, the constitution speaks, but in all other respects, it is silent. Unless we contravene all authority, and read the constitution as a grant of power, by implication, we cannot add to its express limitations.—*Commonwealth v. Maxwell, supra.*

[Southern Railway Co. v. St. Clair.]

In this connection, we deem it necessary to say, that by local taxation, we intend taxation by counties, and by municipal corporations, having authority conferred by law. At all periods of organized government, territorial and State, they have been recognized as political divisions, created and organized as governmental agencies or auxiliaries, to aid by local administration, the sovereign power, in promoting the general welfare within the territorial limits to which they are assigned. It is to these agencies, the power of taxation is usually delegated. A county, has been defined as an involuntary political, or civil division of the State, created by statute to aid in the administration of government. It is in its very nature, character and purpose, public, and a governmental agency, rather than a corporation. Whatever of power it possesses, or whatever of duty it is required to perform, originates in the statutes creating it, or in the statutes declaring the power and duty.—*Askew v. Hale County*, 54 Ala. 639; *Chambers County v. Lee County*, 55 Ala. 534; *Stanfill v. Court County Revenue*, 80 Ala. 287; *Dunn v. County Court*, 85 Ala. 144. As defined by Judge Dillon, a municipal corporation, is a body politic established by law to assist in the civil government of the county, but chiefly to regulate and administer the local or internal affairs of the city, town, or district which is incorporated.—1 Dillon Mun. Cor., § § 19-20. Whatever of power may be delegated to the county, or to the municipal corporation, is the power of the State. Its nature is not changed by the delegation; before the delegation it resided in the legislature, and was capable of exercise by such instrumentality as it appointed.—*Mayor v. Stonewall Ins. Co.*, 53 Ala. 582; *Youngblood v. Sexton*, 32 Mich. 406; (s. c. 20 Am. Rep. 659) ; Cooley Const .Lim. 636.

The theory upon which it is principally insisted, the prohibition of local taxation, is a necessary implication, appears to be, that the system of public schools, contemplated by the constitution, is, a *State* system; and must confer equal benefit upon the children of the prescribed educational age. As local taxation in aid of the public schools, would confer on the schools and children of the localities in which it may be authorized, advan-

tages and benefits in which the schools and children of other localities cannot participate, it is insisted that thereby the uniformity of the system would be disturbed, and the equality of benefit it is intended to confer, displaced. The system is a State system in the sense that it is established in obedience to the mandate of the constitution, and that in express terms the constitution declares it must extend throughout the State, and must confer equal benefit upon the children thereof. It is not a local system; and the mandate of the constitution would not be satisfied, if any of the known, recognized political divisions of the State, (not by the constitution specially excepted), should be excluded from the operation and benefits of the system. So far as equality of benefit is practicable, (speaking now in general terms), none of these children can be subjected to burdens or impositions from which others are relieved; nor can any be favored by the extension to them of rights, or of benefits, or of privileges, from which others are excluded. These are the essential elements and attributes of the system contemplated by the constitution; and all the essential elements and attributes of the system, which has been established and is being maintained.

The precedent for the system, as is apparent from examination and comparison, was drawn from the statute by which the original "system of free public schools," in the State, was created and established. (Pamph. Acts, 1853-4, pp. 8-18); which was revised and amended at the succeeding session of the general assembly.—(Pamph. Acts, 1855-56, pp. 33-48). The latter act was incorporated in the Revised Code of 1867, (§ § 957-1000), and remained of force, until so far as inconsistent, it was superseded by the constitution of 1868. The statutes declared the intention was, "to extend upon equal terms to all the children of our State, the inestimable blessings of liberal instruction;" words of equivalent significance with the words of the constitution declaring the extent of the system of public schools, and the equality of benefit it is intended to confer. Many of the framers of the constitution were familiar with that system, and its adaptation to meet the paramount duty resting upon the State,

to provide for the education of the children of the people. And read in the light of history—of pre-existing constitutions, and pre-existing statutes, as it was read by the framers of the constitution, the presumption is far from being illogical, or strained, that the primary, controlling intent was to adapt the pre-existing system of public schools, to the changed social and political conditions, resulting from the abolition of slavery, by which the number of children, the objects of education, was multiplied.

The statutes authorized each county, except Mobile, "to raise annually by special tax, (in the same manner as other county taxes shall be levied), upon real and personal property within the county, an amount of not exceeding ten cents on each one hundred dollars of valuation for the support of the common schools therein, and for providing suitable houses and procuring libraries and apparatus for such schools." The cause for excepting Mobile, as expressed in the statute, was, that it had established a school system of its own. Thus we find that in the origin of the system, local taxation in aid of the schools, so far from a disturbance of the uniformity of the system, or of the equality of benefit it was intended to confer, was deemed necessary to its efficiency.

In the ordination of the system, the framers of the constitution could not have been unmindful of the variety of situation, of condition; and of necessity of the people of the State—of the several counties, and of the numerous municipalities. There are counties thickly settled; there are others in which comparatively, the population is sparse. There are cities, and there are towns, of varied population and wealth. It would be without precedent, if the State had abdicated the power to adapt the system of public schools to the conditions and necessities of all the people; and had abdicated the power of local taxation only as to the education of children; it is in no other respect, for no other use, supposed, or insisted, the power is diminished. The equality of benefit, contemplated by the constitution, lies in the system the general assembly may establish, when, (a matter for the determination of the general assembly), there is concurrence of like situation, condition, and ne-

cessity.—*Commissioners Public Schools v. County Commissioners*, 20 Md. 449; *Curryer v. Merrill*, 25 Minn. 1; *Richards v. Raymond*, 92 Ill. 612; (s. c. 34 Am. Rep. 151); *Powell vs. Board of Education*, 97 Ill. 295 (s. c. 37 Am. Rep. 123). If more than this is exacted, the system could not accomplish the great end in view, the education of the children of the people. And it is difficult to conceive the reason upon which it is supposed that local taxation disturbs the uniformity of the system, or the equality of benefit it is intended to confer. The schools in the locality in which the taxation may be imposed, remain under the administration of the same officers, State, county, and township, to whom the administration of the system in its entirety is committed. No child is admitted to or excluded from the schools, who could be admitted or excluded, if the taxation did not prevail. No revenue, or sources of revenue, provided by the constitution, or which may be provided by legislation, is diverted from the uses appointed. If the necessities, or conditions of other localities, do not in the estimation of the general assembly require such taxation, they are not compelled to its burdens, and cannot derive its benefits. *Equality* of benefit, does not import *identity* of benefit, which is obviously impracticable.

The next insistence, is, that the tax is not for "a purely local purpose," but is for a State purpose—the maintenance of the public school system of the State. We need not repeat, what has already been said as to the nature and character of the public school system. It is in a proper sense, a State and not a local system. And if it was intended to affirm no more than the general proposition, that a State tax, levied for State purposes, in which all the people of the State have concern, cannot be imposed on a county, or any other local division, to the exclusion of other divisions, the correctness of the proposition could be conceded. Or, if it was intended to affirm, that local taxation can be imposed only for a purpose in which the people of the city, town, or county, are concerned, the proposition would also be conceded—the locality of purpose, or of benefit, lies at the foundation of all local taxation.—Cooley Const. Lim. 636. But, when a city, town or county receives benefits pe-

culiar to themselves, beyond the benefits enjoyed generally by the people of the State, it is but just that they should bear the burden of the taxation, from which the benefits spring.—Burroughs on Taxation, § 27; *Kirby v. Shaw,* 19 Penn. St. 258.

State, and local purposes, are often closely interwoven; and this occurs most often perhaps, in matters pertaining to the general subject of education and schools. In *Merrick v. Amherst,* 12 Allen, 500, the town of Amherst was authorized to issue bonds, necessitating town taxation, to procure the location within it of an agricultural college to be established under the act of congress. That the duty primarily rested on the State to erect the buildings for the use of the college, was admitted, but it was said by Bigelow, C. J.: "If the establishment of a public institution of general utility or necessity in a particular locality would be productive of direct and appreciable benefit to persons, or estates in the vicinity, thereby increasing the value of property there situated, or by the opportunities which it would afford to those residing in the neighborhood to enjoy certain common advantages and privileges with greater facility and at less cost than others having an equal right to participate in them, but who reside, or own estates more remotely situated or in distant parts of the State, we can see no reason why these advantages or benefits should not be taken into consideration in determining the mode in which the public burden of defraying the cost of the institution should be apportioned and distributed." In *Marks v. Perdue University,* 37 Ind. 155, a county was authorized by statute to levy a county tax to procure the location within it of a State university. The court sustained the validity of the statute and said: "Now it seems to us, that taxes collected to discharge an obligation entered into by the county, solely for the purpose of securing the location of the college in that county, cannot in any just sense be said to be collected for any State puropse, as they are solely for a county purpose." In *Gordon v. Cornes,* 47 N. Y. 608, a village was authorized to levy a tax for the erection of a State normal school building within the village. The ground on which the court proceeded, in sustaining the

validity of the tax, was the mutuality of benefit resulting respectively to the State and village.

These are cases, in which the primary duty rested on the State, but there was an intermingling of local interest in the county, or municipality and of benefit, beyond that enjoyed by the people of the State generally. When State and local purposes, are so interwoven; when the real purpose is to promote the interest of the county, or municipality, local taxation is supported by all authority. "A road or a school in a county is of some benefit to all the people of the State; all are privileged to travel the road; all are benefited by the education of the people of the State; but the people of the county, who are compelled constantly to travel the road, and whose children attend the school, receive a direct benefit from the road and school, which makes it appropriate that they should bear the burden of providing for such things by their contribution in the form of a tax."—Burroughs on Taaxtion, § 27. The tax imposed by the statute, is levied by the proper authorities of the county of St. Clair, on property situated in the county, devoted to the better maintenance of the public schools of the county, and is not in any proper sense, (excepting, that authority for its imposition is derived from the general assembly), a State tax, though it may aid in the maintenance of the State system of public schools. Counties, nor municipalities, have an inherent power of taxation; whatever of power they may have, is of legislative delegation; and upon them, in the absence of special constitutional restriction, the general assembly may confer the taxing power in such measure, as it deems expedient—"in other words, with such limitations, as it sees fit, as to the rate of taxation, the public purposes for which it is authorized and the objects (the persons and property) which shall be subjected to taxation."—2 Dillon Mun. Corporations, § 740. That the education of children, the support of public, or common schools—schools not confined to any *class*, but open to all, is a public use supporting taxation, State, or local, cannot be doubted.—Cooley on Taxation, 119. And that local taxation, contributes to the usefulness and prosperity of public schools, is generally regarded as axiomatic.—2

Kent. 196, note; *Livingston County v. Darlington,* 101 U. S. 407.

The suggestion that corporations, or non-residents, owning property in the county, have no direct interest in the better maintenance of the public schools, and ought not to be taxed for their support, is readily answered by the consideration that they have property to protect, and greater security results from the moral, intellectual and social improvement of the community, by which the property is surrounded.—Cooley on Taxation, 120, note 1.

The constitution with much of care, appoints revenues which must be applied to the maintenance of the public schools. It seems to be supposed, that when the revenues, so far as dependent on legislative power, are supplied, the power of the general assembly is exhausted; whatever may be the varying conditions and necessities, there cannot be addition to them, other than by an increase of the public school fund, "from time to time, as the condition of the treasury and the revenues of the State will admit," which is enjoined as a duty, the conditions concurring. Now, if the constitution is read and interpreted, as imposing limitations or restrictions upon legislative power in supplying the public school fund from the treasury and revenues of the State, upon no principle of constitutional construction can it be read, as having relation to local taxation in aid of the maintenance of the schools. As we have endeavored to show, the two subjects, State and local taxation, are distinct, though often allied, when there is mutuality of duty, of purpose and benefit. It is an error, however, to read the constitution, as, (save in one particular), defining and declaring the extent of legislative power in maintaining the schools from the treasury and revenues of the State. The constitution of 1868, enumerated many revenues and sources of revenues which were devoted to the maintenance of the schools; and then, in addition, devoted one-fifth of the aggregate annual revenues of the State. Read, as it was read by the framers of the constitution, in the presence of this pre-existing devotion of one-fifth of the aggregate annual revenue of the State, it becomes apparent, that the intention was, to limit legislative

power only to the appropriation of a sum not less than one hundred thousand dollars annually from the treasury and revenues of the State, leaving all beyond, to the discretion of the general assembly.

The constitution of Pennsylvania, commanded the legislature "to provide for the establishment of schools throughout the State, *in such manner that the poor may be taught gratis.*" In *Commonwealth v. Hartman,* 17 Penn. St. 118, the contention was, that the words we have italicized, limited the power of the legislature, and that no law could be constitutional, which looked to any other object than the gratuitous teaching of the poor. In answer to the contention, C. J. Black said: "The error consists in supposing this defines the *maximum* of the legislative power, while in truth it only fixes the *minimum.* It enjoins them to do thus much, but does not forbid them to do more. If they stop short of that point, they fail in their duty; but it does not result from this that they have no authority to go beyond it." This is peculiarly applicable to the suggestion now pressed. The general assembly cannot do less than perform the duty enjoined by the constitution—but they are not forbidden to do more, if in their discretion, with which there cannot be judicial interference, they deem more promotive of the general welfare.

Lastly, the insistence in support of the implication of the prohibition of local taxation in aid of the maintenance of the public schools, is drawn from, or rather predicated on the section of the constitution referring to Mobile county. The insistence is founded in a misconception of the legislative and judicial history of the State, touching the public school system of Mobile. The legislative history, commencing in 1826, was carefully traced in *Horton v. Mobile School Commissioners,* 43 Ala. 598, and in *Mobile School Commissioners v. Putnam,* 44 Ala. 506. In the last case, after elaborate argument, it was decided, that as the board of education had full legislative power in reference to the public educational institutions of the State, it could displace the officers who had been elected or appointed to manage the school system, and to take the custody and administration of its funds, substituting in their stead, officers of

the appointment of the board—affirming the dependence of the system on legislative power. The removal of this dependence—the preservation of the organization of the system as created and established by the statutes, save in the respects designated, was the manifest purpose of this section, and read in the light of its history, no other purpose or intent is deducible. And it may be remarked, that the section bears internal evidence, that it was framed in view of the section of the statutes having relation to the public school system of Mobile, contained in the statutes, establishing the original system of free public schools.

Though much of stress has been laid on the decisions of this court, in *Schultes v. Eberly,* 82 Ala. 242, and *Elsberry v. Seay,* 83 Ala. 614, it is conceded that the questions there involved, are not analogous to the question now presented. The opinion in the first case, by its own terms was limited to the question, whether it was competent for the legislature to delegate to the trustees of the Cullman School District, the power to tax. And it was said: "We have thus limited the question, as we do not wish what may be said to be understood as applicable to school districts created within the corporate limits of a municipal corporation, when the power to tax resides in the municipal authorities, and is not in excess of the constitutional limitation." The conclusion, after consideration, was, that the school district, was not of the class of corporations, to which the power of taxation could be delegated. In the latter case, the particular question involved was, whether the "Alabama University for the colored people," as established by an act of the general assembly, approved February 27, 1887, (Sess. Acts, 1886-87), being under the exclusive control and management of a board of trustees, selected and appointed as therein provided, but not subject to the supervision of the State Superintendent of Education, was a public school within the meaning of the constitution—this was the sole question the case involved, and the sole question on which the court passed judgment. The inference does not seem fair or just, that the author of the opinions, or the court, had in mind, or gave thought to the question now involved—the power of the general as-

sembly to authorize a county, or a municipal corporation, observing the limitations of the constitution as to the rate of taxation, to devote a part of the revenue derived therefrom, in aid of the public schools within the county, or municipality.

In view of the diversity of uses, to which it has been sought to apply the general language of these opinions, straining and overworking them, it is not out of place to say, that every judicial opinion, (as the opinion of *Schultes v. Eberly, supra,* was to avoid misunderstanding, expressly limited), must be confined to the case before the court. In *L. & N. R. R. Co. v. County Court,* 1 Sneed, (Tenn.) 695, it was said by Caruthers, J.: "The generality of the language used in an opinion is always to be restricted to the case before the court, and it is only authority to that extent. The reasoning, illustrations, or references, contained in the opinion of a court are not authority, not precedent, but only the points in judgment arising in the particular case before the court. The reason of this is manifest. The members of a court may often agree in a decision—the final result in a case—but differ widely as to the reasons and principles conducting their minds to the same conclusion. It is, then, the conclusion only, and not the process by which it is reached, which is the opinion of the court, and authority in other cases. The law is thus far settled, but no farther. The reasoning adopted, the analysis and illustrations presented, in real or supposed cases, in any opinion, may be used as argument in other cases, but not as authority."

In *Cohens v. Virginia,* 6 Wheaton, 399, C. J. Marshall, declaring parts of the opinion in *Marbury v. Madison, dicta* only, said: "It is a maxim not to be disregarded that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation

to the case decided, but their possible bearing on all other cases is seldom completely investigated."

The question now presented, it is conceded, was not before the court, in either of the cases referred to—was not, and could not have been considered, and if there were, as there are not, expressions touching it, such expressions would have been no more than *dicta*.

But, on the contrary, the question of legislative competency to the authorization of municipal maintenance of public schools was presented and passed upon in the recent case of *White v. Mayor and Council of Decatur*, 119 Ala. 476, and while the question did not arise there in the form it arises in this case, the principle there declared is applicable here. It was there held that though "the support and maintenance of public schools is not an essential municipal function, nor is power and duty in that regard uniformly invested in or charged upon municipal authorities, yet it is a function proper to be vested in municipal bodies," etc. etc.

We have considered all points suggested in argument, and, without prolonging discussion, we conclude that viewing the statute in the light most favorable to the appellant it is not open to any objection which would justify us in declaring it violative of the organic law: to say the very least even from that point of view its invalidity is so gravely doubtful as to require us to hold it to be a constitutional enactment.

The judgment of the circuit court must be affirmed.