MADDOX, Justice
(concurring in part and dissenting in part).
This case involves an issue of the right of a child to a public education, a right included in every state constitution since Alabama became a state, but unfortunately a right that has become embroiled in a debate about the doctrine of separation of powers among coordinate, independent branches of state government.
The original question presented to the circuit court in this case was simple enough— Does § 256 of the Alabama Constitution of 1901, as amended, require statewide parity of educational funding and of educational opportunities and resources? The original plaintiffs said that it did, and a circuit judge agreed with them. The original state defendants and the substituted defendants, for whatever reason, did not appeal the circuit judge’s order within the time allowed for an appeal.
This Court’s attention was officially called to the matter when the Alabama Senate asked the Justices, then serving on this Court for an advisory opinion as to the Legislature’s obligation to obey the order, and the Chief Justice and seven Justices then serving on the Court answered the question.[7] Opin *888 ion of the Justices No. 338, 624 So.2d 107 (Ala.1993). The Justices did not directly address the basic legal questions that are now raised by this appeal and that are stated in the main opinion: (1) whether the judgment violated the separation of powers doctrine; (2) whether this action was sufficiently adversarial to make the controversy justiciable and give the trial court subject matter jurisdiction; and (3) whether the “campaign conduct of Judge Reese draws in question the impartiality of the entire judicial proceedings,” the separation of powers issue, and the scope of the remedy order.[8]
In that advisory opinion, the Justices did recognize, however, not only the importance of the legal question presented, but also the duties and obligations of the other branches of government in resolving the basic dispute. The fact that the dispute still exists demonstrates not only the continuing nature of the public’s interest, but also the complexity of the problems that have been created. These problems are exacerbated because the succeeding state defendants in the lawsuit appear to take a different position than the original state defendants on the continuing dispute over which branch of government has the power and obligation to carry out what has been declared to be the intent of the people of Alabama to guarantee to every school-age child an equal opportunity to public education. Unfortunately, the continuing dispute only delays the’ultimate resolution of the basic question — what is to be done about providing what the trial court has declared to be constitutionally required?
Based on my review of what I believe to be the issues in this case, and being cognizant of the people’s commitment to the extension of the opportunities and benefits of a public education equally to all school-age children in the State, I concur with the main opinion on what is called the “Liability Phase” of the case. My concurrence is based on what I believe the law says about the power and duty of a circuit court in a case involving a justiciable controversy, which I find to be present here, to interpret the Alabama Constitution, even if its interpretation necessarily involves duties and obligations that must be performed by the executive and legislative branches of state government. I concur also because I believe that the circuit court correctly concluded that the Alabama Constitu *889 tion does provide that school-age children in Alabama have a right to attend school in what the Alabama Constitution describes as a liberal system of public schools established, organized, and maintained by the state, which provide all children with substantially equal and adequate- educational opportunities.
I cannot agree, however, with the main opinion’s affirmance of the trial court’s so-called Remedy Order in this case, even though the main opinion suspends its effective date. I do not believe that the plaintiffs’ right to an adequate and equal educational opportunity, although a valuable constitutional right worthy of protection by the executive and legislative branches, is one of those basic, inalienable rights, such as the right to vote, or the right not to' be discriminated against on the basis of race or gender, that would compel a court to use all of its extraordinary powers to guarantee its protection. Cf. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), in which the United States Supreme Court rejected a challenge under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, because it did not involve a suspect classification, and, therefore, was not subject to strict scrutiny. Also, see, Committee for Educational Rights v. Edgar, 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178 (1996), in which a majority of the Supreme Court of Illinois, interpreting a provision of the Illinois Constitution, held that equal educational funding was not a fundamental constitutional right, but rather posed a “political question.” But see, Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.1967), in which a Federal district court determined that the plaintiffs were being deprived of an equal educational opportunity because of race, issued specific remedy orders and retained jurisdiction of the case, and policed compliance with those orders.
As the main opinion points out, and as the Chief Justice’s dissenting opinion, as well as the separate opinions filed by other Justices note, this lawsuit has had a long and somewhat tortuous history. During the pendency of this lawsuit, Alabama has had three Governors and two lieutenant governors. In addition, the composition of the Legislature and the composition of this Court have changed, but one thing has not changed — neither the original state defendants nor the substituted state defendants appealed the liability phase order within the time allowed by law, and the constitutional duties and obligations assumed by the substituted responsible public officials remain the same.

The People’s Commitment to Public Education

Anyone reading § 256, Ala, Const, of 1901, as amended, and the constitutional provisions that preceded it, could not help but observe that the people, from the time the first constitution was ratified in 1819, have directed the legislative branch to encourage and preserve public education in this state. In Alabama’s first constitution, Article VI, the people declared the following:
“Schools, and the means of education, shall forever be encouraged in this state; and the general assembly shall take measures to preserve, from unnecessary waste and damage, such lands as are or hereafter may be granted by the United States for the use of schools in each township in this state, and apply the funds, which may be raised from such lands, in strict conformity to the object of such grant....”
After reading this provision, I find two things clear: (1) “schools” and “the means of education” were forever to be encouraged in this state; and (2) the Legislature was required to preserve the lands granted by the United States for the use of schools in each township, and to apply the funds accruing therefrom in strict conformity with the grant. The Constitutions of 1819, 1861, and 1865 included substantially similar provisions relating to public education.

Court Decisions Interpreting Various Constitutional Provisions Relating to Public Education

The system of what were called “common schools” in this state was founded on the grant by the United States of the 16th section in every township for the use of schools, as provided by the act for the admission of *890 the state into the Union. In Elsberry v. Seay, 83 Ala. 614, 3 So. 804 (1888), Justice Clopton, writing for the Court, stated:
“The principle of free elementary education is not of modern origin. Public schools were established for the education of the children of the community, in States which have long since perished; and in some European States, systems of popular education were created at an early period. In New England, common schools originated more than two centuries ago, and, with the spread of popular enlightenment, and the increase of material prosperity, have received in this country their most enlarged development; until a system of public schools has been established in every State of the Union, varying in details, but all preserving the leading feature and distinguishing characteristic — the extension of the opportunities and benefits of popular education to all the children of school age in the state.”
83 Ala. at 617, 3 So. at 806 (emphasis added).
Justice Clopton further wrote: “[T]he diffusion of knowledge, at least elementary, is essential to the preservation of free government, and ... the extension of the opportunities and advantages of education throughout the various parts of the State [is essential].” 83 Ala. at 617-18, 3 So. at 806. Justice Clopton further stated: “The constitutional system of common schools must extend throughout the State, and must afford equal benefit to all the children thereof within the specified years.” 83 Ala. at 816, 3 So. at 806 (emphasis added). Citing Schultes v. Eberly, 82 Ala. 242, 2 So. 345 (1887), he concluded that “the system of public schools, commanded to be established, organized, and maintained, was intended to operate upon, and in favor of, all the children equally, without special local privileges to any.” 83 Ala. at 618, 3 So. at 807 (emphasis added).
I cite these old Alabama cases and judicial interpretations of predecessor provisions of the Alabama Constitution of 1901 relating to public schools to show that from the time Alabama was admitted into the Union its citizens have imposed a duty and obligation on the legislative branch to encourage and to provide a system of public schools, however characterized, “to operate upon, and in favor of all the children equally, without special local privileges to any." In essence, that is what the trial court declared the Alabama Constitution requires today.
This Court had another opportunity to address the question of the intent of the framers of the Constitution relating to public education in Vincent v. County Board of Education of Talladega County, 222 Ala. 216, 131 So. 893 (1931). In Vincent, the Court was asked to construe the same provisions of the Alabama Constitution that the trial court construed in this case. There, the plaintiffs claimed that § 467 and § 182 of the School Code of 1927, which permitted school trustees, “with the approval of the county board of education,” to fix a reasonable incidental fee to be paid by pupils, were unconstitutional on the ground that they violated § 286 of the Alabama Constitution of 1901, which provided for a liberal system of public schools.
Justice Sayre, writing for the Court, said:
“The argument against the constitutional validity of [§ 467] proceeds upon the hypothesis that the Constitution establishes a system of free public schools. But the language of that instrument, as we have heretofore noted, imposed upon the Legislature the duty to establish, organize, and maintain ‘a liberal system of public schools.’ It is quite evident that, if the framers of the Constitution had thought to impose upon the Legislature the duty to establish a system of free public schools, they would have used just that word. ‘Free’ and ‘liberal’ are by no means synonymous. They are both terms of varied meaning and application. The better part of three columns of Webster’s New International Dictionary [is] devoted to definitions of the word ‘free’; but, as applied to schools, that authority defines a free school' as a school where no charge is made for tuition. ‘Liberal’ is also a word of varied meaning. As applied to the public school system we do not doubt that it intends a system as generous and bountiful as a just consideration of the limited power of taxation and the varied needs of the state will in reason justify. Necessarily something must be left to the enlightened dis *891 cretion of the Legislature which, within constitutional limits, levies taxes and apportions them to the various needs of the state. No doubt a liberal system of public education will be so framed as to give every child between the ages of seven and twenty-one years a chance, but, when details of school management are considered, something must be left to legislative discretion. And in Bryant v. Whisenant, 167 Ala. 325, 52 So. 525, 140 Am. St. Rep. 41, and again in Kennedy v. County Board of Education, 214 Ala. 349, 107 So. 907, this court gave its approval to the imposition of a reasonable incidental fee by which to raise funds for heating and lighting school rooms. We do not doubt that similar charges for other necessary incidental fees may be made when authorized by legislative act.
“The Constitution requires ‘a liberal system of public schools.’ This means that the schools shall be liberally maintained, and that they should be open to common and general use. But details of management involving charges such as are involved in this appeal may be left to the school trustees in charge. They, of course,’ are bound to observe the policy disclosed by the Constitution and the statute — the School Code — passed in pursuance thereof and enacted for the purpose of effectuating the objects of the Constitution. But they act in an administrative capacity, as legislative agents, to provide the details of administration, and it cannot be said that such delegation of authority violates any principle of constitutional law, or that the administrative acts here in question do so. State ex rel. Crumpton v. Excise Commissioners, 177 Ala. 212, 59 So. 294, and the cases cited in 12 Corpus Juris, p. 847.
“Our conclusion therefore is that neither section 467 of the School Code, nor the regulations of the school trustees made in pursuance thereof violate any pertinent principle of constitutional law.”
222 Ala. at 217, 131 So. at 894 (emphasis added). Based on what Justice Clopton wrote in Ellsberry v. Seay and what Justice Sayre wrote in Vincent, it appears to me that the people of this State have imposed on the legislative branch the duty to provide a “liberal system of public schools,” established and maintained “in favor of all the children equally, without special local privileges to any.” 83 Ala. at 618, 3 So. at 807.
Although I agree with the trial court’s resolution in the Liability Phase, I believe that the trial judge went too far in his Remedy Order and encroached on the powers the people had delegated to the Legislature to establish and maintain “a liberal system of public education [that] will be so framed as to give every child between the ages of seven and twenty-one years a chance.” Vincent, 222 Ala. at 217, 131 So. at 894 (emphasis added). The Legislature, in carrying out its responsibilities and fashioning its own remedy to correct what the trial court has. determined to be constitutional deficiencies, might consider hearing witnesses, as the trial court did, or might study the transcript of the testimony already taken by the trial court.

Courts’ Power to State What the Law Is

The power, and indeed the duty, of courts to state what the law is seem to be universally accepted. Chief Justice John Marshall, in Marburg v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), interpreting the power of Federal judges to interpret the Federal Constitution, wrote:
“It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule.”
That principle of judicial review stated by Chief Justice Marshall was cited in Opinion of the Justices No. 888. I believe it answers the state defendants’ jurisdictional arguments, and I agree with the result reached on the Liability Phase of this case. I now specifically state the reasons for my disagreement with the conclusion reached in the main opinion that suspends the implementation of the Remedy Plan for a period of one year to allow the Governor and the Legislature to formulate a remedy of their own. Although the Legislature might during that year undertake to comply with the trial court’s order, it appears to me that what Justice Sayre said in Vincent is instructive:
*892 “Necessarily something must be left to the enlightened discretion of the Legislature which, within constitutional limits, levies taxes and apportions them to the various needs of the state. No doubt a liberal system of public education will be so framed as to give every child between the ages of seven and twenty-one years a chance, but, when details of school management are considered, something must be left to legislative discretion.”
222 Ala. at 217, 131 So. at 894.
If we were dealing with such fundamental rights as liberty of conscience, and other procedural democratic rights like the right to vote, which are inalienable in our constitutional democracy, I would consider affirming the Remedy Order, because I believe courts have the power to protect fundamental constitutional rights by every means possible. However, even assuming that the plaintiffs’ rights in this case were fundamental, which I do not, I would question the necessity for so detailed a Remedy Order as the one issued here. As Justice Clopton said in Ellsberry v. Seay, “when details of school management are considered, something must be left to legislative discretion.” 222 Ala. at 217, 131 So. at 894.
Traditionally, courts have been reluctant to issue orders to a coordinate and independent branch of government, and even though I recognize that similar plaintiffs in other states have successfully sought the same type of relief that the plaintiffs seek here, my core belief in the doctrine of the separation of powers is so strong that I believe that the Governor and the Legislature have the duty and the obligation to carry out what the judicial branch has declared to be their constitutional obligations, and if those branches of government carry out their responsibilities, a conflict between coequal and coordinate branches of government would never occur.

The Legislature is Aware of the Educational Problems

That the other branches of government are aware of the plight of public education in Alabama is plain from a reading of some addresses given by former Governors John Patterson and George Wallace and present Governor Fob James.[9] Based on my reading *893 of those addresses and after a cursory reading of some of the history of gubernatorial and legislative efforts to address what has been described as a continuing crisis in public education, I believe that the other two branches are not only aware of the crisis in public education but have proposed their own plans for solving it. Consequently, it would seem -that the mere fact that the plaintiffs here sought the aid of the judiciary in addressing the problem should offer an opportunity for intergovernmental cooperation— not create an interbranch conflict of such magnitude that attention becomes focused on the conflict rather than on solving the problem. In short, the fact that the plaintiffs have asked for a declaratory judgment should not be materially different from the procedure sometimes used by the Governor and the Legislature in seeking an advisory opinion from the Justices of this Court, as permitted by Ala. Code 1975, § 12-2-10.
There is another reason why I would not affirm the Remedy Order. This case does not involve a situation where the interbranch conflict is being played out between a superi- or and an inferior division of government. The interbranch conflict is between equals, and when the power to interpret the law— the power, in the famous words Marbury v. Madison, “to say what the law is,” conflicts with executive or legislative power, that conflict is between equals, and when the judicial interpretation of what the law is creates such a confrontation, a situation could develop where the executive branch says to the judicial branch, as President Jackson reportedly did, “John Marshall has made his decision, now let him enforce it.”[10]

Courts are Reluctant to Issue Orders They May Not Be Able to Enforce

Courts, possessed of neither the purse nor the sword, are generally reluctant to issue orders they cannot enforce, and, frankly, I would apply that principle to this case, because the people have vested in the Governor the power and duty to see that the laws are faithfully executed, and in the Legislature the duty to provide a “liberal system of public schools” that is established and maintained “in favor of all the children equally, without special local privileges to any.” As I have already pointed out, the Governor and the Legislature are aware, as their predecessors have been, of the plight of public education in this State. They represent the branches the people have designated to protect their constitutional rights. I would allow those branches of government discretion in determining how the constitutional rights of these plaintiffs will be protected.
*894 The Liability Phase order states what the Constitution requires, and I must assume that the other branches of government will perform their duties in guaranteeing these plaintiffs and others similarly situated their constitutional rights. The law says that all public officials are presumed to perform their duties, and I must assume that those branches will act expeditiously to guarantee what the Constitution requires and address what the people consider to be one of the state’s major problems, without having a court order hanging over their heads.[11]
In fact, I personally believe that the cause of public education could be harmed if this power struggle and the interbranch conflict continues unabated. Continual debate on who has the power to solve the problem that everyone admits exists can only distract those who have the power to act from doing what they should do.

Conclusion

The plaintiffs have sought a resolution in a case involving a justiciable controversy. The trial court heard substantial evidence, interpreted the law, and decided the “case” or “controversy,” not as a result of a constitutional assignment of a special competence or superiority of the judiciary vis-á-vis the other branches in this regard, but in the performance of a constitutional duty. It would appear that the state defendants would be bound by that judicial resolution, which has become final because the state defendants did not appeal. If these state defendants, or any other defendant, could decide, on a case-by-ease basis, which decisions they will or will not obey, then we would have a government of men, which the Constitution forbids, rather than a government of laws. § 43, Ala. Const. 1901.
In conclusion, the Constitution is a species of law superior to legislative action or inaction. It appears to me that if the state defendants disagreed with the judicial interpretation, they should have appealed to this Court. Having failed to do so, they are bound by the declaration made in the Liability Phase, which states their duties in general terms. In performing their duties, however, I do not believe they should be bound by a specific plan, but should be free to exercise their discretion in protecting what has been judicially determined to be the constitutional rights of Alabama citizens. I personally believe that they will carry out their duties, and I would consider the role of the judicial branch to be at an end once it declared what those duties and responsibilities were.
Based on the foregoing, I concur in part and dissent in part.

. In Opinion of the Justices No. 338, 624 So.2d 107 (Ala.1993), the Alabama Senate requested the Chief Justice and the Associate Justices to render an advisory opinion as to whether the Legislature was required to comply with the circuit court’s order and provide schoolchildren with substantially equitable and adequate educational opportunities. In that opinion, the Chief Justice and Associate Justices then serving, “[b]ecause the question [was] one of great public interest, and because the question raise[d] a question of fundamental constitutional law relating to the separation of powers of government,” elected to express their opinion on the question . the Senate had asked,’ but cited Opinion of the Justices No. 289, 410 So.2d 388, 391-92 (Ala. 1982), and pointed out, "as we did on another occasion when the Legislature asked for the opinion of the Justices on the constitutionality of pending legislation while the basic constitutionality of the same Act was being raised on appeal in an adversary setting: '[T]he procedure, as well as the advisability, of rendering advisory opinions is not without difficulty, particularly in view of the fact that the questions are presented outside the normal adversary system wherein pertinent facts from the record of a trial court would be presented, and the issues would be briefed by attorneys and most times orally argued before the .Court.’ " The Justices also quoted the following from Opinion of the Justices No. 289: " 'It is also instructive to note that advisory opinions are not binding precedents as are decisions on appeal to this Court.’” 410 So.2d at 392. In their opinion to the Senate, the Justices said:
"With those principles [that advisory opinions are not binding precedents] firmly in our minds, we now express our opinion on your request, that is, whether the Legislature is required to comply with the order of the circuit court in the consolidated cases. Our opinion is that the.order has the force of law unless modified by the trial court, until it is modified or reversed on appeal, and the Legislature, like other branches of government, must comply with it.
"Under our State constitution, ‘[t]he powers of the government of the State of Alabama *888 [are] divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.’ Art. Ill, § 42.
"The executive and legislative branches of the State have broad powers and responsibilities in the area of public education, but the powers of each branch of government are bounded by the mandates and restraints of the constitution of the State of Alabama. This principle of separation of powers of government that is now included in the Alabama constitution was first decided in the famous case of Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176-77, 2 L.Ed. 60 (1803). It is the province and duty of the judicial branch of government to interpret the constitution and to say what the law is, and an order issued by a court of competent jurisdiction that interprets the constitution is binding upon the Legislature unless the order is stayed or overturned by a higher court.
"Under the provisions of Amendment 328, Section 6.04, '[t]he circuit court shall exercise general jurisdiction in all cases except as may otherwise be provided by law.' Included within the general jurisdiction of the circuit court is the power to decide whether the actions of the executive or legislative branches are consistent with the requirements of the fundamental law of the people — -their constitution. In short, the circuit court has the power, and indeed the duty, when requested to do'so in cases involving justiciable controversies, to interpret the constitution, and its interpretation, unless changed by a competent court having the power to overturn it, must be accepted and followed. See, 21 C.J.S. Courts § 3, pp. 11-12 (1940).
"Your inquiry, as we understand it, is whether the Legislature is required to follow the order of the Circuit Court of Montgomery County in the consolidated cases referenced above. Our answer, based upon the principles set out herein, is yes."
624 So.2d at 109-10.

. It appears to me that in Opinion of the Justices No. 338, the Justices then serving on this Court addressed the first two issues raised by the State defendants. I joined in that opinion, and my opinion on the law relating to the jurisdiction of the circuit court and the adversarial nature of the case has not changed. Indeed, the separation of powers question involving the power of the Legislature in fulfilling the constitutional requirement of free public education was addressed in an early Alabama case. See Elsberry v. Seay, 83 Ala. 614, 3 So. 804 (1888).

. On June 24, 1959, then Governor John Patterson called the Legislature into special session for the express purpose of passing "Legislation to provide for the necessary revenue and appropriations to meet the existing emergency in education in the State of Alabama." In his address to a joint session of the Legislature, he said that “[n]o state can build higher than its school system.” 1 House Journal of Alabama 3 (Second Special Session 1959).
On May 7, 1963, then Governor George C. Wallace said that "[a]s a matter of principle I am against additional taxes but let me say clearly whatever it takes to solve the educational problems, I am for." He further said: "I pledge my administration will take whatever measures are necessary to correct deficiencies in the present system of education in Alabama and prepare a foundation for an educational system of uneq-ualled excellence.... Whatever it takes to bring us out of educational crises, it will be done.” 1 House Journal of Alabama 19-20 (Regular Session 1963).
On August 4, 1981, then Governor Fob James called the Legislature into extraordinary session, in part for the purpose of enacting "Legislation to make appropriations for the support of public education in the State of Alabama." 3 House Journal of Alabama 3 (First Extraordinary Session 1981). He called the Legislature into a third extraordinary session on November 3, 1981, for the purpose of adopting legislation "to make appropriations for the support and encouragement of educational and industrial activities involving basic and applied scientific research and development.” 3 House Journal of Alabama 4 (Third Extraordinary Session 1981).
While this case was pending, in an address to a joint session of the Legislature, on April 18, 1995, Governor Fob James said, in part, that "not once in more than 12 years has any direct action been taken to identify and remedy the defects of a failing school system,” and that "[w]e are charged tonight with a genuine 'sense of urgency' to rescue thousands of students who will depart their schools with less than eighth-grade learning abilities and/or suffer the tragedy of functional illiteracy. We have begun by expanding the use of Stanford Achievement Tests from testing grades four and eight to testing grades three to 11." The Governor then stated what he described as "[t]he seven fundamentals of a good school,” and said that they were “inseparable.” Among those "fundamentals,” he listed the following:
"Establish a core curriculum in academics that requires basic subject matter courses such as arithmetic ... reading ... geography ... English ... history ... math and science.
"Implement a grading system that accurately measures a student’s knowledge of a given subject and reports progress to parents on a report card. [Footnote cont’d.]
*893 "Hold superintendents and principals accountable for measured improvement in SAT scores using 1995 test scores as a benchmark. Replace management that shows no progress after two full years of intensive guidance and support.
"Adopt a Foundation Program for funding and operations of local schools that meets Southern Association of Colleges and Schools accreditation standards for classroom size ... libraries and personnel.”
He then stated:
"Our goal is clear. We must provide the opportunity for every student in Alabama public schools to achieve academic excellence according to his or her ability and desire to do so.
"Tonight I ask you to 'help me help the children.' We all want two things[:] 1) Schools where our children are safe and 2) schools where our children achieve to the highest levels of their ability.
[[Image here]]
"Our K-12 programs are in crisis. We lose one-third of our students as dropouts. Those who graduate and enroll in college face academic difficulties. Some reports have stated that as much as 35 percent of our college course work involves remedial education.”
1 House Journal of Alabama 99-100 (Regular Session 1995).

. There is some historical evidence (albeit disputed and of an anecdotal nature) that President Jackson believed that he had the power to decline to enforce judicial decrees. President Jackson disagreed with the Marshall Court’s decision in Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), which held that Federal treaties with the Cherokee Nation ousted Georgia’s legislative jurisdiction over whites living in Cherokee territory and that a state criminal conviction accordingly must be set aside. President Jackson reputedly said, "John Marshall has made his decision, now let him enforce it.” See G. Edward White, The Marshall Court and Cultural Change, 1813-1835, 737 (1988). But President Jackson was never called on to enforce the decree; the Governor of Georgia pardoned the defendant. Id. at 737-39.

. I believe that I can take judicial notice that numerous polls show that the people of Alabama consider education one of the most important issues facing the state, and that many candidates for public office run on platforms that promise to address this problem.